# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN NORMAN NEY, | 1:07-00999 DLB HC |
| Petitioner, | ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS, DIRECTING CLERK OF COURT TO ENTER JUDGMENT IN FAVOR OF RESPONDENT, AND DECLINING TO ISSUE CERTIFICATE OF APPEALABILITY |
| v. | |
| JAMES YATES, Warden, | [Doc. 4] |
| Respondent. | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Pursuant to 28 U.S.C. § 636(c)(1), the parties have consented to the jurisdiction of the United States Magistrate Judge.

## RELEVANT HISTORY

On January 10, 2005, the district attorney filed an amended information in the Tulare County Superior Court, charging Petitioner with, in count 1, attempted murder of officer Donnie Smith (Cal. Pen. Code § 664/187(a)),[1] in count 2 through 4, 6, and 7 assault on a peace officer (§ 245(c)), and in count 5, evading a peace officer (Cal. Veh. Code § 2800.2). (Lodged Doc. No. 1, at 229-232.)

On February 3, 2005, following a jury trial, Petitioner was acquitted of counts 1 and 4; however, as to count 2, he was found guilty of the lesser included offense of misdemeanor assault and found guilty of three counts of assault, as charged in counts 3, 6, and 7, and evading a police

---

[1] All further statutory references are to the California Penal Code unless otherwise indicated.

1

1 officer (count 5).  (Lodged Doc. 1, at CT 341.)

2    Petitioner was sentenced to seven years and eight months in state prison, calculated as
3 follows: four years for assault (count 3), eight months for evading an officer (count 5), and
4 eighteen months each for the assaults charged in counts 6 and 7.  (Lodged Doc. No.1, at CT 369.)

5    Petitioner filed a notice of appeal.  On August 3, 2006, the California Court of Appeal for
6 the Fifth Appellate District affirmed the judgment.  (Lodged Doc. No. 3.)

7    Petitioner filed a petition for review in the California Supreme Court on September 6,
8 2006, which was denied on October 11, 2006.  (Lodged Doc. No. 4.)

9    Petitioner filed the instant federal petition for writ of habeas corpus on May 31, 2007 in
10 the United States District Court for the Northern District of California.  The petition was
11 transferred and filed in this Court on July 13, 2007.

12    Respondent filed an answer on November 14, 2007.  (Court Doc. 11.)  Petitioner did not
13 file a traverse.

## STATEMENT OF FACTS

15   On January 8, 2004, Darla Smith, along with her mother and two sons, was driving her
16 vehicle through the Walmart parking lot in Tulare, California.  As she pulled in, she noticed two
17 cars blocking the parking lot row in front of her.  (RT 219-221.)  As she got closer, one car drove
18 off, and the remaining car pulled in front of her and blocked her path preventing her from
19 moving.  (RT 221.)  Darla stopped her car, and Petitioner, who was driving the car that was
20 blocking her path, began making wild gestures and yelling at Darla.  Darla attempted to drive
21 around him, but he prevented her from doing so by pulling out in front and further blocking the
22 path.  (RT 222.)  Darla was forced to stop her car and was unable to back out because of the large
23 volume of traffic.  (Id.)

24   Petitioner got out of his car, walked toward Darla's vehicle and began beating on the
25 driver's side window while yelling obscenities at her.  Darla's mother, Judy Scarbrough, excited
26 the vehicle and called 911 from her cell phone.  (RT 223.)  Darla did not make eye contact with
27 Petitioner and attempted to ignore him because she did not want to escalate him and cause a
28 bigger scene.  (Id.)  She stated that she was afraid of Petitioner and did not know what was going

to happen. (RT 224.)

Darla then observed Petitioner approach her mother who was calling 911 and yell "Go ahead and call the police. I've done this lots of time. Nobody's going to do anything about it." (RT 225.) The dispatch operator advised Scarbrough to stay on the phone until the police arrived. (Id.) During this time, Petitioner continued to yell obscenities towards Darla and her mother, including calling Darla a "fat bitch," and her mother an "old bitch." (RT 241, 245, 247.)

A security guard from Walmart asked Petitioner to move, but he refused stating the guard did not have the authority to make him do so. (RT 226.) Darla observed Petitioner turn off his car and put his seat back as if he was going to take a nap. (RT 239.) A police officer arrived approximately ten to fifteen minutes after the incident began, and spoke to both Petitioner and Darla. After Petitioner refused to leave and then refused to obey the officer's request to stop, a chase ensued between Petitioner and the officer. (RT 228-229.)

Darla's son, Joshua, and her mother, Judy Scarbrough, both testified consistently with Darla's version of the incident. (RT 243-351, 256-271.) Scarbrough confirmed that she called 911 from her cell phone and the tape recording of the call was played for the jury. (RT 262.) Scarbrough added that she heard Petitioner call the officer a "nigger" before driving off. (RT 265-266.)

Walmart Security Officer Patrick Saliem observed Petitioner yelling at Darla as Petitioner was standing near his vehicle. Saliem specifically overheard Petitioner call Darla a "stupid, fucking, fat bitch." (RT 299.) Saliem acknowledged that Darla had entered the parking lot driving the wrong way, as he had observed on several occasions in the past. (RT 301.) He indicated that in order to get to the place where Darla was heading, the person must drive in a circuitous route and then drive back from the opposite direction. (Id.)

Tulare Police Officer Donnie Smith arrived at the scene, and Petitioner initially stated, "I know it's a small thing, but I feel like being an asshole today." (RT 331.) Petitioner complained that he had driven through the parking lot on several occasions and was blocked every time, and he wanted something done about it. (RT 336.) Officer Smith asked Petitioner to calm done and tell him what happened. Petitioner did so and officer Smith agreed with Petitioner that Darla was

3

driving in the wrong direction. Smith advised Petitioner that he would have Darla move. (RT 336.) Petitioner became upset because he wanted the officer to do something more for him. (Id.)

Officer Smith then began to question Darla. During this time, Petitioner yelled out that Darla was a "lying, fat bitch." (RT 337.) Officer Smith directed Petitioner to calm down, get in his car and drive away before the officer turned into an "A hole." Petitioner did not comply and continued to yell profanities at Darla. (RT 337-339.) Petitioner then told officer Smith that he was "no different than the rest of these fat motherfuckers in the world." (RT 340.)

Officer Smith then proceeded towards Petitioner's vehicle and again directed him to get in his car. Petitioner subsequently slammed the door and started "jerking his car" towards the officer. Petitioner lunged his vehicle toward officer Smith twice, ultimately coming approximately two feet from him, causing him to jump back on the sidewalk to avoid being hit. (RT 340-341.) At that point, Smith ordered Petitioner to get out of the car, but Petitioner failed to do so and yelled, "Fuck you." He then proceeded to pull sharply around Darla's vehicle and stopped to yell more profanity at her. (RT 341.) Officer Smith again ordered Petitioner to get out of his vehicle but Petitioner just drove away. (Id.) Smith then returned to his patrol car and followed him to initiate a traffic stop. (Id.)

Tobia Flores, manager of the Walmart Store, confirmed Darla's and officer Smith's testimony that Petitioner was very angry and was yelling profanities at them. (RT 585-588.) Flores observed Petitioner back his vehicle towards officer Smith and, at that time, Flores stated "It looks like he's gonna back into him, hit him." (RT 590.) He believed that if Smith had not moved out of the way he would have been hit. (Id.)

Officer Smith followed Petitioner to the Foods Company parking lot, with his lights and siren activated. (RT 343.) After Petitioner stopped his vehicle, officer Smith exited his vehicle and walked towards the driver's side of Petitioner's vehicle, but as he got close, Petitioner put his car in reverse and started to speed backwards towards Smith. This caused Smith to jump quickly out of the way so Petitioner would not hit him. (RT 344-345.) Petitioner had backed up to the point where his driver's side window was right where officer Smith had been standing. Smith yelled at Petitioner to stop the car, Petitioner refused, yelling "Fuck you," and sped off. As he

was doing so, he attempted to bump Smith with his car, causing him to once again jump out of the way. (RT 345, 347.) Officer Smith returned to his vehicle and called dispatch to report the pursuit. (RT 347.)

The pursuit continued as Petitioner headed south across Prosperity then east on Prosperity to Lincoln Street. (RT 349.) Petitioner ran a red light and was traveling at a speed of sixty-five miles per hour in a forty-five mile-per-hour zone on Prosperity. (RT 350-351.) As the pursuit continued, Petitioner proceeded to drive at a high rate of speed traveling fifty-five miles per hour in a twenty-five mile-per-hour residential zone, running stop signs and almost causing a collision. (RT 352, 356.) At one point, officer Smith heard Petitioner yell "Yahoo." (RT 360.)

As Petitioner had a huge lead on officer Smith, Tulare Police Corporal Altermatt took over the lead of the pursuit staging his vehicle on Bardsley. (RT 366.) Altermatt continued driving behind Petitioner's vehicle which was traveling westbound on Bardsley. (RT 367.) During this time, officer Smith was informed that there was another patrol unit that was stopping traffic ahead in an attempt to avoid a collision. (RT 367.) As Petitioner attempted to turn northbound on Mooney, he slid across the four lanes and crashed into a vehicle that was stopped at the intersection. (RT 368.)

After the crash, officer Smith stopped behind Corporal Altermatt's vehicle, and got of his patrol car. Smith observed both Altermatt and Sergeant Morales, with their guns drawn, yelling at Petitioner to get out of his vehicle. (RT 371, 376.) As Officer Smith was approaching Petitioner's vehicle and when he was within about two feet, Petitioner began to speed backwards towards him. (RT 380.) Smith began to run backwards as fast as he could and began to shoot at Petitioner's vehicle. (Id.) Smith jumped onto the trunk of Altermatt's car, and Petitioner hit the vehicle while Smith was still sitting on the trunk. (RT 387-388.)

Delia Galaz, observed Petitioner quickly put his car in reverse after hitting Altermatt's vehicle, and speed in reverse directly towards officer Smith. She believed Petitioner was trying to hit the officer. (RT 627, 629-630.)

During the pursuit, Kimberly Gilton, was driving south on Mooney approaching Bardsley Street and heard police sirens, so she pulled her Toyota Tundra to the right side of the road and

5

1  observed Petitioner approaching the intersection at a high rate of speed. (RT 547-551.) She
2  watched as Petitioner attempted to made a right hand turn onto Mooney, but lost control crashing
3  into her truck, with a substantial amount of force. (RT 552-553.) She observed Petitioner
4  moving around in his car, and then police arrived and ordered him to put his hands up. (RT 554.)
5  Gilton observed Petitioner put his car in reverse and drive backwards at a high rate of speed
6  towards the police car. (RT 555.) Gilton then heard gunshots. (RT 557.) Gilton had to later
7  undergo physical therapy for her neck and back. (RT 553.)

8        Tulare Police Sergeant Ruben Morales observed Petitioner's car crash into Gilton's
9  vehicle. (RT 810.) He immediately exited his vehicle, drew his gun and walked over to
10 Petitioner's car and identified himself as a police officer. (RT 811.) He ordered Petitioner to put
11 his hands out, but Petitioner did not comply and appeared to be trying to do something with the
12 gear shift. (Id.) Morales kicked the driver side door of Petitioner's car in an attempt to get his
13 attention. Petitioner failed to respond and had his hands in the center console area of his vehicle.
14 (RT 812.) Morales then observed Petitioner quickly put his car in reverse and move backwards,
15 which he had to quickly get out of the way to avoid been hit. (RT 814-816.) Morales then heard
16 shots fired, but he did not fire his own gun. (RT 819, 822.) After Petitioner's vehicle came to a
17 complete stop, Morales watched officers extract Petitioner from his car and take him into
18 custody. (RT 828.) Petitioner was angry and yelled profanities at the officers. (Id.)

19       Tulare Police Lieutenant Jerry Breckinridge observed Petitioner back his vehicle towards
20 officer Smith after he crashed into the Toyota Tundra. (RT 929.) He believed that Petitioner was
21 going to hit Smith, and he observed Smith fire his gun at Petitioner. (RT 929, 934.)

22       Tulare Police Detective Greg Lopez assisted in detaining and arresting Petitioner. (RT
23 703.) He subsequently conducted a pat down of Petitioner for weapons, and found a closed knife
24 bearing a swastika symbol in Petitioner's left front pocket. (RT 704.) Lopez went with
25 Petitioner to the Tulare District Hospital. After arriving there, lab technician Lisa Torres took a
26 blood sample from Petitioner which was given to Lopez. In turn, Lopez gave the sample to
27 Tulare Police Evidence Technician Coffman. (RT 706.)

28       The blood sample was subsequently tested by Forensic Toxicologist Roger Peterson by

1 utilizing a gas chromatograph. (RT 728.) Petitioner's blood sample tested positive for 32

2 nanograms per milliliter of methamphetamine. (RT 729.) Peterson opined that this level of

3 methamphetamine would affect over half of the people and could result in an individual behaving

4 in a more aggressive manner while under the influence of this drug. (RT 732-733.)

5       Tulare Police Corporal Brian Haney collected Petitioner's property after he was arrested

6 and taken to the hospital. (RT 966.) He found a handwritten documented entitled "Top ten

7 reasons people become cops," which was admitted into evidence. (RT 967-968.)

8 **Defense**

9       Ignacio Lopez, was called on behalf of the defense, and testified that he was parked

10 directly behind Kimberly Gilton's Toyota Tundra at the time Petitioner crashed into it. (RT

11 1131.) He observed Petitioner speeding down Mooney and attempt to turn on Mooney, but

12 crashed into the truck. (RT 1127.) He then saw police arrive at the scene and they were telling

13 Petitioner not to move. (RT 1128.) Petitioner did not comply. (RT 1132.) Lopez stated that he

14 never saw Petitioner attempting to run over a policemen. (RT 1139.)

15       Petitioner testified in own defense. Petitioner worked as a home healthcare provider and

16 cared for an elderly woman suffering from Alzheimers. (RT 1140-1141.) Prior to January 8,

17 2004, he did have a criminal record or any speeding tickets. (RT 1142.) Petitioner admitted to

18 using amphetamines one a month when he was tired and needed to get some work done around

19 the house. (RT 1142-1144.) Petitioner denied using methamphetamines or amphetamines on the

20 day of the incident, January 8, 2004. (RT 1143.) On cross-examination, Petitioner admitted to

21 using methamphetamine the day before the incident. (RT 1190.) In addition, he admitted to

22 using marijuana on a weekly basis, and stated that he was not surprised to learn that he had

23 cannabinoids in his blood. (RT 1194.)

24       On January 8, 2004, Petitioner went to Walmart to buy laundry detergent. (RT 1146.) He

25 returned to his vehicle, and as he was attempting to drive out of the parking lot, he was blocked

26 by a woman driving a Lexus the wrong way down the lane. (RT 1149-1150.) The driver of the

27 Lexus motioned for Petitioner to go around, and he told her to go around him because he was

28 traveling in the right direction. (RT 1149.) He stated the driver backed up the Lexus and went

1  around him. (RT 1150.) Petitioner stated that it was "kind of irritating, because it happens not
2  every time I go there, but a lot of times." (RT 1150.)

3        As Petitioner proceeded forward, a sports utility vehicle ("SUV") was behind the Lexus,
4  and the lady driving it refused to move or back out of the way so Petitioner could properly exit
5  the parking lot. (RT 1152.) He told the lady that she was going the wrong way and to back up
6  and let him drive out. (Id.) However, the lady refused to do so and stared straight ahead. (Id.)
7  Petitioner then got out of his car and walked over to the SUV and told her again "You're going
8  the wrong way. Look at the arrow." (RT 1153.) He stated the lady continued to star straight
9  ahead and did not acknowledge him. (Id.) Petitioner stated that he became angry because she
10 ignored him and did not acknowledge that she was driving in the wrong direction. (RT 1154.)
11 Petitioner opined that if she had apologized, the incident probably would have been over. (RT
12 1154.) Petitioner acknowledged that he yelled loudly and used profanity. (RT 1155.)

13       An officer arrived at the scene, and agreed with Petitioner that the driver of the SUV was
14 driving in the wrong direction. (RT 1158.) Petitioner stated that the officer told him he would
15 have the driver back up her vehicle and drive around in the proper direction. (RT 1158.) The
16 officer then went and talked to the driver of the SUV and returned to Petitioner and told him to
17 leave. (RT 1159.) Petitioner was angry and told officer Smith "You're no different than that
18 stupid bitch." (Id.) Petitioner then drove his car past officer Smith and denied ever attempting to
19 hit the officer with his car or calling him a "nigger." (Id.)

20       Petitioner stated that as he drove slowly past the officer and the SUV, the officer shook
21 his head as if stating "look at this stupid guy." (RT 1160.) Petitioner got angry. (Id.) In
22 response Petitioner yelled "FU pig." (RT 1161.) Petitioner noticed the officer get in his patrol
23 car and follow him through the parking lot. Petitioner stopped his vehicle and the officer
24 approached and told him to "Get the hell out of that vehicle." (RT 1163.) Petitioner stated that
25 he was scared because he thought he would be arrested. (RT 1163-1164.) Petitioner claims that
26 he accidentally put his car his reverse, and when he realized he slammed on the brakes and the
27 officer was standing right by his door. (RT 1164.) Petitioner was scared because he did not
28 know what the officer was going to do, so he put the car in drive and left. (RT 1165.) Officer

8

1  Smith followed him with the lights and siren activated. Petitioner felt that he was going to be
2  arrested, so he decided to try to drive home so he could explain to his wife what was going on.
3  (RT 1166.) Petitioner admitted that he ran through stop signs and intersections. (RT 1167.)
4       Petitioner eventually crashed in a truck after attempting to negotiate a turn too fast. (RT
5  1171.) The airbag in Petitioner's car deployed causing a lot of dust inside. (Id.) Petitioner put
6  his car in reverse and attempted to back out. However, shortly thereafter, he was shot by police
7  officers. (RT 1173-1174.) One bullet hit his left check, and he was shot in the shoulder and in
8  the back. (RT 1179-1180.)

9                                        DISCUSSION

10 A.    Jurisdiction

11      Relief by way of a petition for writ of habeas corpus extends to a person in custody
12 pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws
13 or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,
14 529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000). Petitioner asserts that he suffered
15 violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises
16 out of the Tulare County Superior Court, which is located within the jurisdiction of this Court.
17 28 U.S.C. § 2254(a); 2241(d).
18      On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act
19 of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its
20 enactment. Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114
21 F.3d 1484, 1499 (9th Cir. 1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting
22 Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct.
23 1114 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059
24 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant
25 petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.
26 B.    Standard of Review
27      This Court may entertain a petition for writ of habeas corpus "in behalf of a person in
28 custody pursuant to the judgment of a State court only on the ground that he is in custody in

violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The AEDPA altered the standard of review that a federal habeas court must apply with respect to a state prisoner's claim that was adjudicated on the merits in state court. Williams v. Taylor, 120 S.Ct. 1495, 1518-23 (2000). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade,123 S.Ct.1166 (2003) (disapproving of the Ninth Circuit's approach in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)); Williams v. Taylor, 120 S.Ct. 1495, 1523 (2000). "A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Lockyer, at 1175 (citations omitted). "Rather, that application must be objectively unreasonable." Id. (citations omitted).

While habeas corpus relief is an important instrument to assure that individuals are constitutionally protected, Barefoot v. Estelle, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392 (1983); Harris v. Nelson, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a criminal conviction is the primary method for a petitioner to challenge that conviction. Brecht v. Abrahamson, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993). In addition, the state court's factual determinations must be presumed correct, and the federal court must accept all factual findings made by the state court unless the petitioner can rebut "the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769 (1995); Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457 (1995); Langford v. Day, 110 F.3d 1380, 1388 (9th Cir. 1997).

C.   Insufficient Evidence to Support Conviction for Assault on Officer Smith (Count 6)

Petitioner contends that insufficient evidence supports his conviction for assault on officer Smith (§ 245(c) as charged in Count 6. In Count 6, Petitioner was charged with assault upon officer Smith at the accident scene. (CT 352.) The specific facts which formed the

1  foundation of this charge were that Petitioner placed his car in reverse after crashing into the

2  truck at the intersection. Petitioner claims that he could not see officer Smith and therefore could

3  not have formed the requisite intent to assault him.

4        Petitioner presented this claim to the California Court of Appeal and the California

5  Supreme Court. (Lodged Doc. Nos. 3, 4.) Because the California Supreme Court's opinion is

6  summary in nature, however, this Court "looks through" that decision and presumes it adopted

7  the reasoning of the California Court of Appeal, the last state court to have issued a reasoned

8  opinion. See Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3, 111 S.Ct. 2590, 115 L.Ed.2d 706

9  (1991) (establishing, on habeas review, "look through" presumption that higher court agrees with

10 lower court's reasoning where former affirms latter without discussion); see also LaJoie v.

11 Thompson, 217 F.3d 663, 669 n. 7 (9th Cir.2000) (holding federal courts look to last reasoned

12 state court opinion in determining whether state court's rejection of petitioner's claims was

13 contrary to or an unreasonable application of federal law under § 2254(d)(1)).

14       The law on insufficiency of the evidence claim is clearly established. The United States

15 Supreme Court has held that when reviewing an insufficiency of the evidence claim on habeas, a

16 federal court must determine whether, viewing the evidence and the inferences to be drawn from

17 it in the light most favorable to the prosecution, any rational trier of fact could find the essential

18 elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979).

19 Sufficiency claims are judged by the elements defined by state law. Id. at 324, n. 16.

20       Section 245(c) defines assault on a peace officer as follows:

> Any person who commits an assault with a deadly weapon or instrument, other than a firearm, or by any means likely to produce great bodily injury upon the person of a peace officer or firefighter, and who knows or reasonably should know that the victim is a peace officer or firefighter engaged in the performance of his or her duties, when the peace officer or firefighter is engaged in the performance of his or her duties, shall be punished by imprisonment in the state prison for three, four, or five years.

(§ 245, subd (c); CT 306.)

      Notably, as stated by the Court of Appeal, under California law, an assault does not

require a specific intent to cause injury; rather an "'assault only requires an intentional act and

11

actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another." (Lodged Doc. No. 3, Opinion, at 9, quoting People v. Williams, 26 Cal.4th 779, 790 (2001).) Sufficient evidence supports the finding that Petitioner committed an assault upon officer Smith at the accident scene, even if he could not see officer Smith.

The evidence presented at trial established that Petitioner deliberately and intentionally put his car into reverse after the collision, and several witnesses including Petitioner's own testimony confirm this finding. Specifically, Delia Galaz observed Petitioner quickly put his car in reverse after hitting her truck, then proceed directly backwards toward officer Smith. (RT 627.) At this time, officer Smith was standing directly behind Petitioner's vehicle, and he had to quickly jump onto the trunk of Corporal Altermatt's vehicle to avoid being hit. (RT 382.)

Eyewitnesses, Gilton, Lopez, and Sergeant Morales all testified consistently that after Petitioner crashed into her truck, several officers were on the scene and were yelling for Petitioner to put his hands up. (RT 554, 810-812, 1128, 1132.) However, Petitioner ignored the orders and continued to speed quickly in reverse. In addition, both Lieutenant Breckinridge and Corporal Altermatt believed Petitioner was going to hit officer Smith. (RT 929, 1089.)

Petitioner's own testimony supports the finding that he was, at a minimum, well aware that his erratic driving would probably and directly result in a battery on a police officer. Petitioner admitted that he deliberately put his car in reverse after the collision because he felt that things could not get any worse and he just wanted to keep going. (RT 1173.) In addition, Petitioner acknowledged observing a police car in the rearview mirror when he placed his car in reverse. (RT 1175.) Petitioner stated that he drove his car about four feet in reverse and claimed he was not trying to make the car accelerate, but his foot may have been pushing the gas after he got shot. (RT 1177.)

This evidence clearly supports the finding that, in utter disregard for the officer's safety and orders, Petitioner put his car in reverse and accelerated backwards directly towards it, assaulting officer Smith. The state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

D.   Admission of Evidence

Petitioner contends that the trial court erred in admitting the written document entitled, "the top ten reasons people become cops," which was found on Petitioner at the hospital. In addition, Petitioner contends that court erred in admitting the knife found on him which was marked with a swastika.

As with Petitioner's prior claim, this claim was presented on direct appeal to the California Court of Appeal and California Supreme Court. (Lodged Doc. Nos. 3, 4.) Applying the look through doctrine,

Generally, the admissibility of evidence is a matter of state law, and is not reviewable in a federal habeas corpus proceeding. Estelle, 112 S.Ct. at 477; Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir.), *cert. denied,* 478 U.S. 1021 (1985). Nevertheless, there can be habeas relief for the admission of prejudicial evidence if the admission was fundamentally unfair and resulted in a denial of due process. Estelle, 112 S.Ct. at 482; Pulley v. Harris, 465 U.S. 37, 41, 104 S.Ct. 871, 874 (1984); Walters v. Maas, 45 F.3d 1355, 1357 (9th Cir. 1995); Jeffries v. Blodgett, 5 F.3d 1180, 1192 (9th Cir. 1993), *cert. denied*, 510 U.S. 1191, 114 S.Ct. 1294 (1994); Gordon v. Duran, 895 F.2d 610, 613 (9th Cir.1990).

1.   Admission of Written Document

The trial court allowed the prosecution to introduce the document written by Petitioner entitled, "the tope ten reasons people become cops", which was found by Police Corporal Brian Haney among Petitioner's personal items at the hospital. The document contained the following statement:

Top ten reasons people become cops

1) not smart enough to do anything else.

2) they like all the attention they get from (expletive deleted) when they're in uniform

3) they're allowed to shoot people.

4) they like to control people

5) doughnuts

6) they got bullied as kids

7) sirens and flashing lights

8) they like to drive fast

9) they get to grow that cool village people mustache

10) they get to break the laws that they write tickets for.

(Lodged Doc. No. 5; Supp CT at 1.)

The court excluded the bottom portion of the document which referred to a Molotov cocktail finding it was too prejudicial. The Court also excluded the reference to the "cool village people." (RT 884-885.) The trial court found that the information in the document was probative of Petitioner's state of mind shortly after the incident, and his feelings regarding law enforcement was highly relevant, and the probative value outweighed any prejudicial effect. (RT 884-885, 1045.)

Corporal Brian Haney testified that he found the document at the jail in a bag containing Petitioner's personal property taken from him at the hospital. (RT 974.) Petitioner admitted that he wrote the document while at the hospital after an officer told him that he would not give Petitioner's wife a note from him. (RT 1197.)

In rejecting Petitioner's claim that the document was not relevant to show his state of mind because it was created after the incident giving rise to the charges against him, the Court of Appeal stated, in relevant part:

> [Petitioner] cites no authority to support his suggestion that state of mind cannot be shown by evidence of subsequent conduct. Rather, [Petitioner's] relevancy challenge rests on his assertion that, besides the list, there was no other evidence he had "a possible pre-existing bias towards officers." [Petitioner] asserts that "being shot by police officers is a significant intervening event which would logically affect [his] state of mind toward officers." Thus, he suggests his hostility towards law officers did not rise until *after* he was shot, and the list was a reaction to that experience rather than reflective of his state of mind and feelings towards police officers during the incident. We find [Petitioner's] reasoning unpersuasive.
> Contrary to [Petitioner's] assertion, the record is replete with evidence of a preexisting disrespect for police officers. Early on in the incident, [Petitioner] called Officer Smith a "pig," a common epithet directed towards police officer. He then assaulted the officer in three separate locations, and led him and other officers on a high-speed chase during which Officer Smith heard [Petitioner] yell "yee-haw." [Petitioner's] behavior in the Foods Co. parking lot could also be construed as particularly contemptuous of police officers. [Petitioner] stopped his car, thereby creating an appearance of compliance. Then, after Officer Smith got out of his car and was in a more exposed and vulnerable position, [Petitioner]

1  reversed his car towards the officer and shouted profanity out the window before
   speeding away again. We do not agree with [Petitioner's] assertion that the
2  evidence reflected only one motive for [Petitioner's] behavior, i.e., a perception
   that the officer "just joined the ranks of the world that he perceived as against
3  him." Disrespect for police officers was also indicated by [Petitioner's] conduct
   throughout the incident. As the trial court reasoned, [Petitioner's] "Top ten" list
4  was probative of the nature of [Petitioner's] feelings towards police officers near
   the time of the incident and was relevant to issues such as motive, malice, and
5  premeditation raised by the attempted murder count. Furthermore, with regard to
   motive, the jury was correctly instructed that although it was not an element of the
6  crimes charged, "[p]resence of motive may tend to establish the defendant is
   guilty. Absence of motive may tend to show the defendant is not guilty."
7  (CALJIC No. 2.51.)

8  (Lodged Doc. No. 3, Opinion, at 12-13.)

9        Here, as stated by the Court of Appeal, the evidence was admitted in order to show

10 Petitioner's motive for committing the assault. As such, the admission of the writing was not

11 fundamentally unfair and did not result in a denial of due process. The trial court carefully

12 limited the admission of the evidence by excluding reference to the "cool village people" and

13 reference to a Molotov cocktail finding it was too prejudicial. The trial court reasonably

14 concluded that the remaining contents of the writing was relevant to demonstrate Petitioner's

15 motive. In addition, as noted by the Court of Appeal, Evidence Code section 1101 subdivision

16 (b) allows the admission of subsequent conduct if such evidence is relevant to prove some fact

17 other than the disposition to commit the crime such as, motive, opportunity, intent, preparation,

18 plan, identity or knowledge. (Evid. Code § 1101, subd. (b).) Therefore, because there was a

19 permissible inference the jury could draw from the evidence, the state courts' determination of

20 this issue was not contrary to, or an unreasonable application of, clearly established Supreme

21 Court precedent.

22       2.     <u>Admission of Knife with Swastika Symbol</u>

23       Petitioner contends that the trial court erred in allowing the prosecution to introduce the

24 fact that the pocketknife he was carrying at the time of arrest bore a swastika symbol. The

25 prosecutor initially expressed his intent to introduce the swastika in its case-in-chief based on

26 Scarbrough's testimony that Petitioner called officer Smith a "nigger." (RT 785-786.) The court

27 denied the prosecution's request finding that it would be more "prejudicial than probative, just

28 standing alone without any explanation as to what, if anything, that meant to the defendant."

In the alternative, the prosecutor sought to introduce the evidence on cross-examination if Petitioner testified. (RT 785-786.) The court granted this request reasoning that any prejudicial effect would be minimized by allowing Petitioner the opportunity to explain why he had the knife. (Id.)

The following colloquy took place during the prosecutor's cross-examination of Petitioner:

> [PROSECUTOR]: Q. Isn't it true that there is a swastika on that knife?
>
> A. Yes, there is.
>
> Q. So wouldn't it be accurate to say that the reason this whole thing happened is because you were so upset and you wanted something to be done about this person that you believed was going the wrong way and you don't like authority and you got upset that not only did a police officer not take your side, but the fact is he's a black police officer; isn't that true?
>
> [DEFENSE COUNSEL]: Objection. Compound and argumentative.
>
> THE COURT: It's compound. Sustained.
>
> [PROSECUTOR]: Q. Isn't it true that it bothered you that above all else it was a black police officer telling you what to do?
>
> A. No.

(RT 1235-1236.)

On subsequent redirect, Petitioner acknowledged that he could not possibly be considered a Nazi because he is Catholic and denied being a racist. (RT 1238.)

In rejecting Petitioner's claim on direct appeal, the Court of Appeal stated, in relevant part:

> [Petitioner's] conduct towards the officer, as well as evidence he used a racial epithet, was sufficient to put racism in issue as a potential motive for assaulting the officer and was relevant to the prosecution's theory that [Petitioner's] conduct was motivated by a dislike of police officers and racism, as well as anger, despite [Petitioner's] assertions to the contrary. [footnote omitted.] Moreover, the testimony regarding the swastika was brief, and as the court planned, the prejudicial effect was minimized by its exclusion from the prosecution's case-in-chief. On this record, we cannot say the court abused its discretion in admitting the evidence over the defense's objection.

(Lodged Doc. No. 3, Opinion, at 16-17.)

As Petitioner placed his credibility at issue by testifying and denied being a racist, the fact that he was carrying a knife bearing a swastika emblem, was proper impeachment evidence. Specifically, the fact that Petitioner had the knife bearing the swastika was relevant and admissible to impeach his denial that he called officer Smith a "nigger" and his successive statement that he was not a racist. The trial court carefully excluded the evidence from the prosecution's case-in-chief and limited it for the narrower purpose of impeaching Petitioner and to establish his motive. Accordingly, the trial court's admission of this impeachment evidence was not erroneous, and the state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

### ORDER

Based on the foregoing, it is HEREBY ORDERED that:

1. The instant petition for writ of habeas corpus is DENIED;

2. The Clerk of Court is directed to enter judgment in favor of Respondent; and,

3. The Court declines to issue a certificate of appealability. 28 U.S.C. § 2253(c); Slack v. McDaniel, 529 U.S. 473, 484 (2000) (a COA should be granted where the applicant has made "a substantial showing of the denial of a constitutional right," i.e., when "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong"; Hoffman v. Arave, 455 F.3d 926, 943 (9th Cir. 2006) (same). In the present case, the Court finds that reasonable jurists would not find debatable that the state court decision unreasonable."

Petitioner's petition for writ of habeas corpus therefore is objectively denying.

IT IS SO ORDERED.

Dated:   **June 16, 2008**         /s/ **Dennis L. Beck**
                                   UNITED STATES MAGISTRATE JUDGE